UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
A.H. and V.B., individually and on behalf of N.B., a child
with a disability,

                                         Plaintiff,

       -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                                      Defendant.

-------------------------------------------------------------------------------X

24 Civ. 4828 (JGLC)

**ORIGINAL FILED BY ECF**

**ORAL ARGUMENT REQUESTED**


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Anton Cohen (AC 4680)
Sandra Robinson (SR 8646), Of Counsel
LAW OFFICE OF ANTON G. COHEN, P.C.
*Attorneys for Plaintiff*
618 Coney Island Avenue
Brooklyn, NY 11218
Tel: (718) 702-5702
Fax: (646) 798-3548

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT……………………………………………………  1

STATEMENT OF FACTS…………………………………………………………  1

STATUTORY FRAMEWORK……………………………………………………  11

STANDARD OF REVIEW…………………………………………………………  12

ARGUMENT ……………………………………………………………………...  15

  I.    THE DOE FAILED TO OFFER N.B. A FREE AND APPROPRIATE PUBLIC
      EDUCATION FOR THE 2023-2024 SCHOOL YEAR; THE POORLY
      REASONED AND UNSUPPORTED SRO AND IHO DECISIONS CONTAIN
      LEGAL AND FACTUAL ERRORS, THEREBY MERITING NO JUDICIAL
      DEFERENCE …………………………………………………………………...  16

      A.    The Preponderance of the Evidence Establishes that the June 27, 2023 IEP
          Was Substantively Deficient in Failing to Offer N.B. ABA, Thereby Denying
          Him a FAPE for the 2023-2024 School Year……………………………………  16

      B.    The DOE's June 27, 2023 CSE Engaged in Impermissible Predetermination
          in Deciding Not to Recommend ABA in N.B.'s IEP; the SRO and IHO Failed
          to Determine This Issue and Merit No Judicial Deference …………………….  24

      C.    The DOE Committed Substantive Procedural Violations in Failing to
          Conduct a Functional Behavior Assessment ("FBA") and Behavior
          Intervention Plan ("BIP"), Resulting in a Denial of FAPE; the SRO Erred in
          Concluding Otherwise, and the IHO Erred in Failing to Decide the Issue;
          Neither Merit Deference…………………………………………………………  27

  II.    TRIBECA PREPARATORY SCHOOL WAS AN APPROPRIATE SCHOOL
      FOR N.B.…………………………………………………………………………  30

  III.    THE EQUITIES SUPPORT PARENTS' REQUEST FOR PAYMENT OF
      TRIBECA PREPARATORY SCHOOL TUITION FOR THE 2023-2024
      SCHOOL YEAR …………………………………………………………………  32

  IV.    THE DOE VIOLATED N.B.'S RIGHTS UNDER SECTION 504 OF THE
      REHABILITATION ACT …………………………………………………………  33

CONCLUSION………………………………………………………………………...  35

## TABLE OF AUTHORITIES

**Cases**

*A.M. v. NYC Dep't of Educ.*, 845 F.3d 523 (2d Cir. 2017) ...................... 13, 16, 17, 18, 19, 23, 30

*A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165 (2d Cir. 2009) .. 13

*B.R. ex rel. K.O. v. NYC Dep't of Educ.*, 910 F. Supp. 2d 670 (S.D.N.Y. 2012) ......................... 30

*B.S.M. v. Upper Darby Sch. Dist.*, 103 F.4th 956 (3d Cir. 2024) .................................................. 15

*Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152 (2d Cir. 2021) ......................... 14

*C.F. v. NYC Dep't of Educ.*, 746 F.3d 68 (2d Cir. 2014) ................................................... 12, 19, 30

*C.L. v. NYC Dep't of Educ.*, No. 12 CIV. 1676 (JSR), 2013 WL 93361
(S.D.N.Y. Jan. 3, 2013) .................................................................................................................. 29

*C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826 (2d Cir. 2014) .................................. 32, 33

*C.S. v. NYC Dep't of Educ.*, 6 F. Supp. 3d 424 (S.D.N.Y. Feb. 29, 2016) ............................. 14, 15

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2008) .............................. 25, 26, 27

*E.H. v. NYC Dep't of Educ.,* 164 F. Supp. 3d 539 (S.D.N.Y. 2016) ................................. 25, 26, 27

*E.H. v. NYC Dep't of Educ.*, 611 F. App'x 728 (2d Cir. 2015) ..................................................... 23

*E.M. v. NYC Dep't of Educ.*, 758 F.3d 442 (2d Cir. 2014) .......................................................... 12

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017) ............ 12, 16

*F.B. v. NYC Dep't of Educ.*, 132 F. Supp. 3d 522 (S.D.N.Y. 2015) ............................................ 14

*F.O. v. NYC Dep't of Educ.*, 976 F. Supp. 2d 499 (S.D.N.Y. 2013) ...................................... 13, 22

*Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356 (2d Cir. 2006) ......................................... 12

*G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552 (S.D.N.Y. 2010) ......... 32

*G.B. v. Tuxedo Union Free Sch. Dist.*, 486 F. App'x 954 (2d Cir. 2012)…………………………32

*G.B. v. NYC Dep't of Educ.*, 145 F. Supp. 3d 230 (S.D.N.Y. 2015) ............................................ 33

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105 (2d Cir. 2007) .................................. 13, 31

*Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir. 2001) ........................... 34

*Honig v. Doe*, 484 U.S. 305 (1988) ............................................................................... 16

*J.D. v. NYC Dep't of Educ.*, 677 F. App'x 709 (2d Cir. 2017) ............................................... 14, 24

*J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60 (2d Cir. 2000) .................................................... 15

*J.L. on behalf of J.P. v. NYC Dep't of Educ.*, No. 17-CV-7150 (PAC) (KHP), 2024 WL 2864330 (S.D.N.Y. Jan. 26, 2024) ................................................................................. 33, 35

*J.L. on behalf of J.P. v. NYC Dep't of Educ.*, No. 17 CV 7150 (DLC), 2024 WL 2700563 (S.D.N.Y. May 24, 2024)……………………………………………………………………..……34

*K.N. v. Gluster City Bd. Of Educ.*, 379 F. Supp. 3d 334 (D.N.J. 2019) ........................................ 15

*L.M.P. on behalf of E.P. v. Sch. Bd. of Broward Cnty., Fla.*, 879 F.3d 1274 (11th Cir. 2018) ............................................................................................... 16

*L.M.P. v. Sch. Bd. of Broward Cnty., Fla.*, No. 05-CV-60845-KAM, 2016 WL 10935216 (S.D. Fla. Sept. 7, 2016) ..................................................................................... 16

*L.O. v. NYC Dep't of Educ.*, 822 F.3d 95 (2d Cir. 2016) ..................................... 11, 27, 28, 29, 30

*L.R. v. NYC Dep't of Educ.*, 193 F. Supp. 3d 209 (E.D.N.Y. 2016) ......................................... 21

*Le Pape v. Lower Merion Sch. Dist*, 103 F.4th 966 (3d Cir. 2024) ....................................... 15, 33

*Lillbask v. State of Conn. Dep't of Educ.*, 397 F.3d 77 (2d Cir. 2005) ....................................... 13

*M.H. v. NYC Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012) ................................................... 13, 21

*M.M. v. NYC Dep't of Educ.*, No. 21-CV-3693 (BMC), 2024 WL 3904771 (E.D.N.Y. Aug. 22, 2024)… ............................................................................................. 14, 31, 32

*P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111(2d Cir. 2008) ......................... 23

*P.K. ex rel. S.K. v. NYC Dep't of Educ., (Region 4)*, 819 F. Supp. 2d 90 (E.D.N.Y. 2011) ......... 17

*P.K. ex rel. S.K. v. New York City Dep't of Educ., (Region 4)*, 526 F. App'x 135 (2d Cir. 2013) 17

*R.E. v. NYC Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012) ..................................................... passim

*R.K. v. NYC Dep't of Educ.*, No. 09-CV-4478 (KAM), 2011 WL 1131492 (E.D.N.Y. Jan. 21, 2011) ........................................................................................................... 30

*R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173 (11th Cir. 2015)................................................ 25

*Reyes v. NYC Dep't of Educ.*, 760 F.3d 211 (2d Cir. 2015) ......................................................... 24

*S.B. v. NYC Dep't of Educ.*, 15-CV-1869, 2017 WL 4326502 (E.D.N.Y. Sept. 28, 2017) .......... 14

*S.B. v. NYC Dep't of Educ.*, 174 F. Supp. 3d 798 (S.D.N.Y. 2016) ....................................... 32, 33

*Scaggs v. N.Y. State Dep't of Educ.*, 2007 WL 1456221 (E.D.N.Y. May 16, 2007)……………...33

*S.W. and J.W. v. Warren*, 528 F. Supp. 2d 282 (S.D.N.Y. 2007) ........................................ 33, 34

*T.C. v. NYC Dep't of Educ.*, No. 15 CIV. 2667 (KPF), 2016 WL 4449791 (S.D.N.Y. Aug. 24, 2016) .................................................................................................................................... 23

*T.K. v. N.Y.C. Dep't of Educ.*, 810 F. 3d 869 (2d Cir. 2016) .................................................. 25, 31

*V.S. ex rel. D.S. v. NYC Dep't of Educ.*, 25 F. Supp. 3d 295 (E.D.N.Y. 2014)............................ 24

*W.G. v. NYC Dep't of Educ.*, 801 F. Supp. 2d 142 (S.D.N.Y. 2011)........................................... 15

*Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119 (2d Cir. 1998) ............................... 11, 13

## Statutes

20 U.S.C. § § 1400 *et seq*................................................................................................ 11

20 U.S.C. § 1400(d)(1)(A)………………………………………………………………………11

20 U.S.C. 1412(a)(1)(A)……………………………………………………………………………12

20 U.S.C. § 1412(a)(5)(A) ........................................................................................ 22

20 U.S.C. § 1414(d)(1)(A)(i)(III)………………………………………………………….....21

20 U.S.C. § 1414(d)(1)(B)(iv)(I)………………………………………………………....4

20 U.S.C. § 1414(d)(1)(B)(iv)(III)………………………………………………..………..4

20 U.S.C. § 1414(d)(3)(B)(i) ...................................................................................... 27

20 U.S.C. § 1415(i)(2)(A)…………………………………………………………………...12

20 U.S.C. § 1415(i)(2)(C) ........................................................................................ 12

29 U.S.C. § 794................................................................................................ 33

29 U.S.C. § 794(a) ............................................................................................................... 1

N.Y. Educ. Law § 4401(1)…………………………………………………………….....12

N.Y. Educ. Law § 4402(2)(a)…………………………………………………………….12

N.Y. Educ. Law § 4404(1)(c) .............................................................................................. 12

N.Y. Educ. Law § 8801 ......................................................................................................... 4

## Regulations

34 C.F.R. § 300.39(a)(2)(i)………………………………………………………………16

34 C.F.R. § 300.39(a)(3)(i)………………………………………………………………16

34 C.F.R. § 300.324(a)(2)(i) ................................................................................................. 27

8 NYCRR § 200.1(mmm)...................................................................................................... 28

8 NYCRR § 200.1(r)................................................................................................................ 5

8 NYCRR § 200.22(a)(3)........................................................................................................ 28

8 NYCRR § 200.4(b)(1)(v)..................................................................................................... 28

8 NYCRR § 200.4(d)(3)(i)...................................................................................................... 28

## PRELIMINARY STATEMENT

Plaintiffs A.H. and V.B. (hereinafter "Parents"), on behalf of their minor child, N.B., submit this Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment. Parents seek reversal of the erroneous decision of the State Review Officer ("SRO"), upholding a similarly flawed decision of the Impartial Hearing Officer ("IHO") finding that the New York City Department of Education ("Defendant" or "DOE") provided N.B. with a free and appropriate public education ("FAPE") and, therefore, was not required to reimburse Parents for the cost of N.B.'s unilateral placement at the Tribeca Preparatory School ("Tribeca Prep") for the 2023-2024 school year. Both administrative officers below failed to consider evidence and decide material issues leading to legally and factually incorrect decisions. They do not warrant any deference.

Parents respectfully request that the Court grant their Motion for Summary Judgment in its entirety, vacate the decision and order of the SRO, and award tuition reimbursement for the denial of a FAPE and/or violation of N.B.'s rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) ("Section 504").

## STATEMENT OF FACTS

At the start of the 2023-2024 school year, N.B. was a five-year-old first grader with diagnoses of: Autism Spectrum Disorder ("ASD"), with accompanying intellectual impairment and language impairment; Attention Deficit Hyperactivity Disorder ("ADHD") combined presentation; and Developmental Coordination Disorder. (Exhibit ("Ex.") P-J at 11). N.B. struggled with significant to severe deficits across all domains of development, including communication, language, behaviors, social-emotional functioning, academics, fine motor, and gross motor skills. (Exhibits ("Exhs.") P-J, P-M at 6-7 ¶¶ 15, 16). As set forth below, N.B. had not progressed in the DOE's kindergarten program pursuant to his Individualized Educational

Program ("IEP") during the 2022-2023 school year program. In contrast, the following 2023-2024 school year he thrived at Tribeca Prep, a private school which provided him with necessary full-time 1:1 Applied Behavior Analysis ("ABA") services in a small, structured and low student-to-teacher ratio special education classroom.

**N.B.'s Kindergarten 2022-2023 School Year.** For the 2022-2023 school year, N.B. attended kindergarten in a self-contained special education class consisting of twelve students, one special education teacher, and one classroom paraprofessional ("12:1+1 class") located in an NYC DOE Non-specialized Community Public School No. 8 ("P.S. 8") in Staten Island, NY. (Ex. P-O at 1 ¶ 2). In addition, N.B. had a full-time Health Paraprofessional ("1:1 Health Para") and received weekly related services of Speech and Language Therapy, Occupational Therapy, Physical Therapy, and Counseling. (Transcript ("Tr.") 78-79; Exhs. P-O at 3 ¶ 7, P-L at 3 ¶ 8, DOE-4 at 1, DOE-5 at 1).

Despite such intensive programming, N.B. was unable to progress during that school year, with regression in his communication skills and behaviors. (Tr. 151; Ex. P-J at 11 ("[s]ince starting kindergarten, [N.B.] has made limited progress.")). More specifically, he had "stopped requesting … became more dependent … lost skills such as identifying body parts;" his vocabulary skills stagnated; he developed new maladaptive behaviors; and signs of anxiety emerged. (Tr. 151-52; Ex. P-O at 3-4 ¶ 8). By the end of the 2022-2023 school year, he had not made any discernable academic progress. (Tr. 151-52 (N.B.'s academic skills "flatlined")).

By the spring of N.B.'s kindergarten year, his continuing struggles convinced Parents that his needs were not being addressed in the 12:1+1 special education class at P.S. 8. (Ex. P-O at 4 ¶¶ 9, 10). Accordingly, Parents arranged for N.B. to be evaluated by Dr. Preetika Mukherjee ("Dr. Mukherjee"), a well-credentialed pediatric neuropsychologist with extensive experience

working with children with autism. (*Id*., Tr. 332; Ex. P-L at 1 ¶¶ 1-2). Over the course of four

days, Dr. Mukherjee tested N.B.'s cognitive abilities, language skills, academics levels, social-

emotional functioning, and behaviors; she reviewed his records; observed him in his 12:1+1

special education class; and conducted interviews with both his classroom teacher and private

after-school ABA therapist. (Ex. P-J at 1, 2, 5).

Dr. Mukherjee's classroom observation took place in N.B.'s 12:1+1 kindergarten class

with his 1:1 Health Para. (Ex. P-J at 5). During that observation, she observed N.B. exhibiting

maladaptive behaviors, including screaming; running from his seat and out of the classroom

necessitating holding him down to keep him from running away; task refusal; removing his shoes

and refusing to put them back on; and aimlessly jumping and flapping his hands. (Tr. 346-47,

351-54; Ex. P-J at 5). Dr. Mukherjee noted that he was unable to jointly attend to an activity

longer than one minute and required "constant redirection, hand-on-hand support, and repetition

to engage in any task." (Ex. P-J at 5). Dr. Mukherjee's observations of N.B. represented a

"typical day" for him. (Tr. 335, 374).

Additionally, Dr. Mukherjee found N.B. to be "extremely self-directed;" did not initiate

or engage in activities with others; was "mostly involved in his 'own world;'" and exhibited (1)

limited eye contact; (2) "extremely limited" spontaneous language; (3) sensory sensitivities; (3)

poor social skills; (4) adaptive skill deficits; (5) attention deficits; (6) difficulty engaging in

tasks; (7) significant anxiety; and (8) interfering maladaptive behaviors. N.B. tested at the less-

than first percentile in his ability to apply knowledge. (Tr. 373-74; Exhs. P-J at 6-10, P-L at 4-5

¶¶ 11-12).

Dr. Mukherjee ultimately concluded that N.B. had ASD with accompanying intellectual

impairment and language impairment; ADHD, Combined Presentation, Moderate; and

Developmental Coordination Disorder. (Ex. P-J at 11). She further concluded that N.B., then nearing the end of kindergarten, had "made limited progress" since starting kindergarten, (*id.*), and that he required a 12-month self-contained, therapeutic, special education classroom with 1:1 ABA services with the oversight of a Board Certified Behavior Analyst ("BCBA"). (Tr. 331; Exhs. P-J at 11, P-L at 4-6 ¶¶ 11, 12, 14).

New York Education Law defines ABA as "the design, implementation, and evaluation of environmental modifications, using behavioral stimuli and consequences, to produce socially significant improvement in human behavior, including the use of direct observation, measurement, and functional analysis of the relationship between environment and behavior." N.Y. Educ. Law § 8801. ABA is "a scientific approach to understanding and changing socially significant behaviors," (Ex. P-M at 4 ¶ 10), that relies on data collection to monitor and analyze a child's responsiveness to the intervention with changes made as needed to produce positive results. (Exhs. P-M at 4-5 ¶¶ 10, 11, P-N at 3 ¶ 6). Research has shown that children with autism who receive appropriate ABA services can decrease their maladaptive behaviors while improving positive behaviors and skills in the areas of language and communication, academics, attention, social skills, adaptive and life skills. (Exhs. P-K at 1, P-L at 6 ¶ 16, P-J at 12).

**The June 27, 2023 CSE Meeting and Resulting IEP.** On June 27, 2023, the DOE's Committee on Special Education ("CSE") convened a meeting to consider Dr. Mukherjee's evaluation and develop N.B.'s IEP for the 2023-2024 school year. (Ex. DOE-6 at 2-3 ¶ 8). The DOE's CSE witness, school psychologist Steven Popel ("Mr. Popel"), participated in the CSE meeting as district representative,[1] as did N.B.'s classroom teacher, Dr. Mukherjee and Parents.

---

[1] A district representative is a legally mandated IEP Team member, who "is qualified to provide, or supervise the provision of specially designed instruction to meet the unique needs of children with disabilities … [and] is knowledgeable about the availability of resources in the [school district]." 20 U.S.C. § 1414(d)(1)(B)(iv)(I) and (III).

(Ex. DOE-6 at 2-3 ¶¶ 7, 11). Dr. Mukherjee's neuropsychological assessment was the only evaluation used by the CSE in developing N.B.'s IEP. (Tr. 90; Ex. DOE-2 at 2). At the meeting, Dr. Mukherjee explained her findings and recommendations, stressing N.B.'s need for 1:1 ABA services under BCBA supervision in his classroom. (Tr. 340-41, 357-58; Ex. P-L at 7 ¶¶ 20, 24). Parents echoed Dr. Mukherjee's input and concerns. (Ex. P-O at 6-7 ¶ 14). At the same time, Mr. Popel agreed that N.B. should receive ABA services and, for that reason, changed N.B.'s placement from P.S. 8 to a DOE Specialized School ("District 75 school") where, as Dr. Mukherjee recommended, ABA could be provided with BCBA supervision. (Tr. 90, 95, 99-100; Ex. DOE-6 at 9 ¶ 27). Although Mr. Popel knew of only one District 75 school that offered ABA services, (Tr.101-102), he did not recommend ABA services in N.B.'s IEP in accordance with an apparent CSE practice, (Tr. 90 ("we [the CSE] don't write ABA as recommendations.").

In addition, the DOE did not conduct a functional behavior assessment ("FBA"), (Tr. 90 (neuropsychological evaluation only evaluation considered); Ex. DOE-1 at 6), to provide the CSE with further information of N.B.'s interfering behaviors, including their root causes and possible treatments, *see* 8 NYCRR § 200.1(r), and the DOE did not develop a behavior intervention plan ("BIP") based thereon.

After the June 27, 2023 CSE meeting, the DOE assigned N.B. to a District 75 school. In New York City, the delivery of special education to a student with a disability is a two-step process: (1) the CSE first meets to develop the student's IEP, after which (2) a DOE placement officer finds a school that can implement the IEP mandates. (Tr. 93, 101).

After the CSE meeting, Parents received a letter from the DOE ("School Location Letter"), offering N.B. a placement in a DOE Specialized District 75 school, 75R373:P.S. R373, located at 91 Henderson Avenue, Staten Island, N.Y. 10301 ("P.S. R373 at 91 Henderson Ave").

(Tr. 113-14; Exhs. DOE-2 at 5, DOE-3 at 1, P-O at 8 ¶ 16). However, as Parents learned during their July 21, 2023 school visit, P.S. R373 at 91 Henderson Ave did not offer ABA. (Tr. 119, 159-60 (no guarantee of ABA); Ex. P-O at 9 ¶ 17).

Knowing that N.B. required ABA services, which the DOE could not provide, Parents considered Tribeca Prep as a possible placement for N.B. in the event the DOE could not ultimately provide him the needed ABA program. (Ex. P-O at 6 ¶ 13). Following an involved admissions process (records review, including review of the neuropsychological evaluation, as well as interviews with Parents, observation of N.B.), Tribeca Prep determined that its ABA program would be appropriate for N.B. and offered Parents a seat for N.B. for the 2023-2024 school year. (Tr. 229-236; Ex. P-M at 5-6 ¶¶ 12, 13). On July 27, 2023, Parents signed an enrollment contract with Tribeca Prep for the 2023-2024 school year, (Exhs. P-D at 8, P-O at 10 ¶ 20), to ensure an appropriate placement for N.B. if the DOE was unable to do so. The contractual terms allowed Parents to terminate the contract if, prior to September 15, 2023, they decided to place N.B. in a DOE public school program. (Ex. P-D at 2).

On August 23, 2023, Parents submitted a letter to the DOE explaining their reasons for objecting to the DOE's IEP and the District 75 school placement offer, their intent to unilaterally place N.B. at Tribeca Prep for the 2023-2024 school year, and seek public funding for his tuition costs through a due process proceeding. (Tr. 167; Ex. P-B). While Parents would have considered a public school placement other than P.S. R373 at 91 Henderson Ave, (Tr. 148, 167; Ex. DOE-6 at 8 ¶ 23), the DOE failed to offer such other placement(s) as it did not respond to their August 23, 2023 letter. (Ex. P-O at 10 ¶ 21). Parents were, therefore, left with no choice but to place N.B. at Tribeca Prep, a private school that could offer N.B. a full-time 1:1 ABA program for the 2023-2024 school year. (Ex. P-O at 10 ¶¶ 20, 21, 22).

**Placement at Tribeca Prep for the 2023-2024 school year.** Tribeca Prep is a small, private school, located at 109 Nassau Street, New York, New York 10038, (Ex. P-D at 1), for students with developmental disabilities, including students, like N.B., who have autism. Tribeca Prep employs ABA in 1:1 or 2:1 student-to-teacher ratio instructional settings within a small class environment of six to eight students, with BCBA supervision, and related services, including Speech and Language Therapy, Occupational Therapy, Physical Therapy, and social skills training. (Ex. P-M at 2-4, 14 ¶¶ 5, 10, 36).

N.B. started at Tribeca Prep on September 7, 2023, (Ex. P-D at 1), and was placed in a small, special education class of five other students with similar learning needs taught by a New York State licensed special education teacher. (Ex. P-M at 8, 11, 18 ¶¶ 18, 19, 29, 48, 49). There, he was provided with full-time 1:1 ABA services by qualified registered behavior technicians under the supervision of a dedicated BCBA, who both set up the programs and provided staff training and support. (Tr. 222-24, 226-27, 249-56, 267-68, 290; Ex. P-M at 9-12 ¶¶ 19,[2] 29[3]). N.B. also received related services of Speech and Language Therapy, Occupational Therapy, and Physical Therapy by New York State licensed therapists, and social skills training by a school psychologist. (Ex. P-M at 15 ¶ 36). Tribeca Prep's staff, including N.B.'s teacher and 1:1 ABA instructors, were trained in ABA and supervised by a BCBA. (Tr. 249-51, 266, 275-76; Ex. P-M at 1, 4, 11-12 ¶¶ 2, 10, 29). In addition, Tribeca Prep's Head of School, Dr. Kimberly Mosca ("Dr. Mosca"), and Director of Education, Sarah Orlans, both doctoral level BCBAs and

---

[2] Tribeca Prep's tuition affidavit contains an error at paragraph 4 indicating that N.B. received 2:1 instruction. (Tr. 258; Ex. P-G at 1). Tribeca Prep's tuition of $129,167 is the correct tuition amount for the 1:1 instruction N.B. received over a 10-month period for the 2023-2024 school year. (Tr. 294).

[3] Kimberly Mosca affidavit mistakenly indicates 2022-2023 as the school year; it should state 2023-2024 school year. (*See* Tr. 195; Ex. P-M at 11 ¶ 29).

Licensed Behavior Analysts, were closely involved in N.B.'s program. (Ex. P-M at 9, 12 ¶¶ 19, 29, 30).

N.B.'s 1:1 ABA instruction focused on increasing his socially appropriate replacement behaviors while reducing his interfering maladaptive and non-purposeful behaviors, such as echolalia and scripting, self-directed and perseverative behaviors, and task refusal. (Tr. 238, 241-42, 244-45; Ex. P-M at 12-14, 17-18 ¶¶ 32, 34, 35, 46). N.B.'s ABA instructor taught N.B. learning-readiness skills such as following simple one-step and two-step directions, attending and focusing, expanding his verbal communication, and improving his social skills, including peer-interactions, (Ex. P-M at 13-14 ¶¶ 34, 35)—all areas that required considered attention and interventions according to Dr. Mukherjee's neuropsychological evaluation. (Ex. P-J at 11-13).

Tribeca Prep's 1:1 ABA services used positive behavior supports, such as a token economy, to encourage performance of less preferred activities; clear antecedents and expectations; break-down of required tasks into smaller learnable segments; positive verbal praise and attention; movement breaks, including the use of the sensory gym to modulate self-regulation and promote engagement; a "first-then" approach rewarding N.B. after performing a particular activity "first;" positive reinforcement to redirect his attention, and, when needed, physical/tactile and proximal redirection. (Tr. 141-42, 268-72, 292-94; Ex. P-M at 6, 9-10, 14 ¶¶ 23, 35). Tribeca Prep gathered extensive data on N.B. to monitor his responsiveness to his ABA program and to modify it as needed to ensure his ongoing progress. (Ex. P-M at 4-5, 9 ¶¶ 10, 11, 19). In addition, Tribeca Prep assessed N.B.'s skills throughout the 2023-2024 school year to establish his baseline levels, create goals and programming, and monitor progress and adjust his program as needed to ensure continued progression in all educational areas, including communication, academics, pre-academics, self-management, behaviors, adaptive behaviors,

activities of daily living, and fine and gross motor skills. (Tr. 218-20, 299-300; Ex. P-M at 4-5 ¶¶ 10-11, 18).

N.B. received daily individualized academic instruction in reading, math, writing, and language using an academic curriculum connected to New York State Common Core standards, (Ex. P-M at 12 ¶ 31), and individualized his academic instruction based on academic levels derived from academic assessments. (Tr. 299-300; Ex. P-M at 12-13 ¶¶ 31, 32 (initial assessments showing beginning kindergarten reading and language skills, beginning 1st grade math skills). He received further instruction and interventions in the areas of adaptive behaviors, activities of daily living, attentional skills, language and communication, sensory regulation, behavioral regulation, emotional regulation, fine and gross motor skills, and management needs. (Tr. 236-39 (toileting skills, morning routine, safety awareness), 290-91 (social skills), 302 (daily living skills); Ex. P-M at 9-10, 14, 12-18 ¶¶ 23, 32-46).

Tribeca Prep provided N.B. with related services that met his unique needs: (1) his Speech and Language Therapy focused on increasing his receptive, expressive, and pragmatic language skills, (Ex. P-M at 9-10, 15-16 ¶¶ 23, 37-39); (2) Occupational Therapy aimed to improve his regulatory behaviors and sensory input; improve his gross, fine and visual motor skills; increase his attention; increase his independence by teaching activities of daily living skills, (Ex. P-M at 13, 16-17 ¶¶ 33, 40-44); and (3) Physical Therapy addressed his gross motor skill deficits, (Ex. P-M at 17 ¶ 45). In addition, N.B. received two weekly sessions of social skills instruction led by Tribeca Prep's school psychologist, along with imbedded daily social skills instruction and adaptive behavior skills instruction from his 1:1 ABA instructor. (Tr. 290-91, 296, 302, 305).

At the time of the impartial hearing held on October 31, 2023 and November 8, 2023, N.B. had already begun to show progress: he advanced from ELA Kindergarten Level Unit 1 to Unit 2, (Ex. P-O-11 ¶ 23); demonstrated improved emotional regulation; improved his ability to follow directions; adjusted well to his morning routine; ate lunch independently, (Tr. 242, 245); sat at the table with his peers (an initial struggle), (Tr. 245); had become part of his peer group, which he initially avoided, (Tr. 244); required fewer verbal prompts, (Tr. 242-43); and was overall more present in school, willing to try novel experiences and activities, and more open to learning, (Tr. 242, 244-45).

### *Procedural History*

On September 7, 2023, Parents submitted a request for an impartial hearing, also known as a due process complaint notice ("DPC"), alleging, *inter alia*, that the DOE denied N.B. a FAPE by failing to recommend ABA in his IEP, predetermining its decision not to recommend ABA in N.B.'s IEP, and failing to conduct an FBA and develop a BIP.  Whereupon Parents requested tuition reimbursement for the cost of N.B.'s unilateral placement at Tribeca Prep for the 2023-2024 school year. (Ex. P-A at 5-6).

An impartial hearing was held on October 31 and November 8, 2023, before IHO Michele S. Babbitt, Esq. *See* IHO Findings of Fact and Decision ("IHO Decision") at 3. The DOE submitted 7 exhibits, 6 of which were admitted into evidence, and presented affidavit and live testimony of three witnesses. (*Id*. at 22). Parents submitted 16 exhibits, all admitted, and presented affidavit and live testimony of four witnesses: Dr. Mukherjee, pediatric neuropsychologist; Dr. Mosca, Tribeca Prep Head of School; Celia Roche, N.B.'s private BCBA and ABA provider; and N.B.'s father, ("V.B."). (*Id.* at 22-23).

The IHO Decision was issued on January 10, 2024, and found that the DOE met its burden of establishing the June 27, 2023 IEP offered N.B. a FAPE and, based thereon, denied Parents' claim for tuition reimbursement for their unilateral placement of N.B. at Tribeca Prep for the 2023–2024 school year. (IHO Decision at 19-20). The IHO did not determine the appropriateness of Tribeca Prep or whether the equities supported Parents' claim for tuition reimbursement. (*Id.*).

On February 9, 2024, Parents filed a notice of appeal and request for review with the SRO seeking reversal of the IHO Decision. By decision entered on April 1, 2024, the SRO affirmed the IHO Decision, and, like the IHO, did not decide the appropriateness of Tribeca Prep or whether the equities supported Parents' tuition claim. (SRO 24-048 at 17).

## STATUTORY FRAMEWORK

The IDEA, 20 U.S.C. § § 1400 *et seq*., is designed to ensure that all children with disabilities are provided with a Free and Appropriate Public Education ("FAPE"). *See Id*. at § 1400(d)(1)(A). A school district must comply with the IDEA's procedural requirements to provide each disabled child with "'special education and related services' tailored to meet the unique needs of a particular child." *Walczak v. Florida Union Free Sch. Dist*., 142 F.3d 119, 122 (2d Cir. 1998) (internal citation omitted). Parents may be entitled to relief based on procedural violations that significantly impede their opportunity to participate in the IEP decision-making process, or cause educational loss, or deprive the student of a FAPE. *L.O. v. NYC Dep't of Educ*., 822 F.3d 95, 109 (2d Cir. 2016). Additionally, procedural violations may individually or cumulatively result in the denial of a FAPE. *See Id*. at 123.

To meet its substantive obligation under the IDEA, a school district must "offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).[4]

If a school district fails to provide a FAPE to a student with a disability, parents may unilaterally enroll their child in a private school and seek direct tuition funding or reimbursement for the cost of the private school program. *See E.M. v. NYC Dep't of Educ.*, 758 F.3d 442, 451 (2d Cir. 2014); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006). A three-prong test applies to determine whether parents are entitled to funding/reimbursement for their child's unilateral placement: (1) was the educational program proposed by the school district for the student appropriate; (2) if not, was the private placement appropriate to meet the student's needs; and (3) whether equitable considerations support the parent's claim. *See C.F. v. NYC Dep't of Educ.*, 746 F.3d 68, 73 (2d Cir. 2014). In New York, school districts have the burden of proof on the first prong, whereas parents have the burden on the second prong. *See* N.Y. Educ. Law § 4404(1)(c); *C.F.*, 746 F.3d at 76. This three-prong test is commonly referred to as the "*Burglington/Carter*" test. *See R.E. v. NYC Dep't of Educ.*, 694 F.3d 167, 184–85 (2d Cir. 2012) (internal citation omitted).

## STANDARD OF REVIEW

When an aggrieved party appeals the decision of the state administrative agency, the IDEA provides that the "court shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(A), (C). Summary judgment is a "'pragmatic procedural mechanism' for review of

---

[4] Pursuant to New York state law and regulations, the DOE is responsible for providing a FAPE to all students residing in New York City, between the ages of 3 and 21, who have been classified as students with disabilities. *See* N.Y. Educ. Law §§ 4401(1), 4402(2)(a); 20 U.S.C. § 1412(a)(1)(A).

administrative decisions." *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (*citing Lillbask v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

In doing so, "the district court must engage in an independent review of the administrative record and make determinations based on the 'preponderance of the evidence.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (internal citation omitted). Generally, a court must accord "due weight" to the determinations of state educational agencies on questions of educational policy. *Id.* at 112-13; *M.H. v. NYC Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (judicial review is "colored by an acute awareness of institutional competence and role"), while at the same time not "simply rubber stamp[ing] administrative decisions." *R.E.*, 694 F.3d at 184 (*quoting Walczak*, 142 F.3d at 129). The degree of deference owed to an administrative decision turns on whether the administrative decision is "reasoned and supported by the record," *Gagliardo*, 489 F.3d at 114; "grounded in thorough and logical reasoning," *M.H.*, 685 F.3d at 244; and whether the testimony, evidence, and contrasting arguments presented by both parties were considered, *see F.O. v. NYC Dep't of Educ.*, 976 F. Supp. 2d 499, 513–15, 518 (S.D.N.Y. 2013) (administrative decision failing to consider "contrary testimony" not entitled to deference). Even on questions of educational policy, such as the appropriateness of a student's IEP or a subsequent school placement, no deference is owed to findings of either the SRO or IHO that are clearly not supported by the record. *See A.M. v. NYC Dep't of Educ.*, 845 F.3d 523, 545 (2d Cir. 2017) ("District Court and administrative officers' reliance on the views of [School District representative], which were against the clear consensus of the substance of the evaluative materials present at the CSE meeting and the views of [the student's] evaluators and educational instructors[,] … was error"); *S.B. v. NYC Dep't of Educ.*,

15-CV-1869, 2017 WL 4326502, at *9 (E.D.N.Y. Sept. 28, 2017) (SRO and IHO decisions that were "conclusory, generic, lacking 'thorough and careful' analysis … [and] 'tellingly, silent about [] contrary testimony' on most disputed issues" entitled to "diminished deference, at best.") (internal citation omitted); *F.B. v. NYC Dep't of Educ.*, 132 F. Supp. 3d 522, 550 (S.D.N.Y. 2015) ("SRO's two-sentence discussion of the appropriateness of [offered school placement] is too cursory to merit deference … [and] does not reveal genuine engagement with the Parents' claim.").

Moreover, deference is not inherently warranted if both the SRO and IHO come to the same conclusion. *See M.M. v. NYC Dep't of Educ.*, No. 21-CV-3693 (BMC), 2024 WL 3904771, at *6 (E.D.N.Y. Aug. 22, 2024) (court overturned SRO's and IHO's determination that plaintiff's unilateral placement was not appropriate: "it is my responsibility to independently verify their determinations").

Rather, "the Court need not uphold consistent decisions by the IHO and SRO when they are both 'poorly reasoned and unsupported by the record.'" *S.B.*, 2017 WL 4326502, at *9 ("the Second Circuit has never instructed that increased deference is warranted simply because the IHO and SRO came to the same ultimate conclusion. To the contrary, the Court need not uphold consistent decisions by the IHO and SRO when they are both 'poorly reasoned and unsupported by the record.'") (internal citation omitted); *see J.D. v. NYC Dep't of Educ.*, 677 F. App'x 709, 713 (2d Cir. 2017) (reversing the IHO and SRO's decisions uniformly holding in favor of the DOE).

Finally, questions of law do not require deference and are reviewed de novo. *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021); *C.S. v. NYC Dep't of Educ.*, 6 F. Supp. 3d 424, 447 (S.D.N.Y. Feb. 29, 2016) (reversing SRO based on error of law,

i.e., its determination that DOE offered a substantively appropriate school placement); *W.G. v. NYC Dep't of Educ.*, 801 F. Supp. 2d 142, 167 (S.D.N.Y. 2011) ("interpretation of the IDEA and the definition of 'emotional disturbance'" invokes de novo review). Furthermore, questions of whether the IDEA's statutory and regulatory provisions were correctly applied is a mixed question of law and fact, which courts review de novo. *See J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 64 (2d Cir. 2000).

IDEA's modified de novo review standard does not apply to Section 504 claims. *See B.S.M. v. Upper Darby Sch. Dist.*, 103 F.4th 956, 965 n.6 (3d Cir. 2024) ("we decline to extend [IDEA's modified de novo] review to claims under the ADA and Section 504") (*quoting Le Pape v. Lower Merion Sch. Dist*, 103 F.4th 966, 983 (3d Cir. 2024); *K.N. v. Gluster City Bd. Of Educ.*, 379 F. Supp. 3d 334, 344 (D.N.J. 2019).

## **ARGUMENT**

This case is unlike many other administrative hearings under the IDEA, in which the parties debate over the appropriateness of competing teaching methodologies. Here, Parents and the DOE actually agreed that N.B. needed ABA to receive educational benefits; however, ABA was not recommended in N.B.'s IEP for the 2023-2024 school year.

Both the SRO and the IHO committed legal and factual errors that resulted in ill-reasoned decisions not warranting deference. Neither the SRO nor the IHO grappled with the central issue in this case: Whether, where the parties agreed based on the evaluative information that N.B. required ABA services, the DOE's failure to include ABA in N.B.'s IEP resulted in a denial of a FAPE and a violation of Section 504.

I.      **THE DOE FAILED TO OFFER N.B. A FREE AND APPROPRIATE PUBLIC EDUCATION FOR THE 2023-2024 SCHOOL YEAR; THE POORLY REASONED AND UNSUPPORTED SRO AND IHO DECISIONS CONTAIN LEGAL AND FACTUAL ERRORS, THEREBY MERITING NO JUDICIAL DEFERENCE**

   A.   **The Preponderance of the Evidence Establishes that the June 27, 2023 IEP Was Substantively Deficient in Failing to Offer N.B. ABA, Thereby Denying Him a FAPE for the 2023-2024 School Year**

   *Failure to Include ABA in IEP Denied N.B. a FAPE*

   In this case, even though all IEP meeting participants agreed that N.B. needed ABA to progress, that service was improperly omitted from his IEP and, consequently, was not offered in the recommended public school placement. Hence, N.B. was denied a FAPE. This case illustrates the central importance of an IEP in guaranteeing the delivery of special education services to a student with a disability. The Supreme Court has regarded the IEP as the "centerpiece of the [IDEA's service] delivery system"—the IDEA's vehicle by which special education services are delivered to a student with a disability. *Andrew F.*, 580 U.S. at 391 (*citing Honig v. Doe*, 484 U.S. 305, 311 (1988)). The IEP is a written statement that includes specially designed instruction,[5] including educational services and supports and related services[6] tailored to the child's unique needs. *See R.E.*, 694 F.3d at 175.

   Courts have determined that ABA must be on a student's IEP if the student requires it to obtain a FAPE. *See L.M.P. v. Sch. Bd. of Broward Cnty., Fla.*, No. 05-CV-60845-KAM, 2016 WL 10935216, at *12 (S.D. Fla. Sept. 7, 2016) ("ABA services fall within the broad definitions of 'special education' and 'related services'"), *aff'd sub nom. L.M.P. on behalf of E.P. v. Sch. Bd. of Broward Cnty., Fla.*, 879 F.3d 1274 (11th Cir. 2018); *A.M.*, 845 F.3d at 545 ("requir[ing]

---

[5] "Specially designed instruction" means "adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction … [t]o address the unique needs of the child that result from the child's disability." 34 C.F.R. § 300.39(a)(3)(i).

[6] Related service are defined as "developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education." 34 C.F.R. § 300.39(a)(2)(i).

some level of ABA support" to establish adequacy of IEP); *P.K. ex rel. S.K. v. NYC Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 113 (E.D.N.Y. 2011) (terminating services, including ABA, denied student a FAPE), *aff'd*, *appeal dismissed*, 526 F. App'x 135 (2d Cir. 2013).

In New York City, the specific school placement is not included in an IEP, but is later determined by a DOE placement officer charged with locating a school that can implement the IEP. (Tr. 93 (Mr. Popel: "we [the CSE] choose the program;" a district officer assigns the student to the closest available school).

The DOE here denied N.B. a FAPE by failing to recommend ABA in his IEP even though no member of the CSE disputed his need for ABA. The creators of the June 27, 2023 IEP—Mr. Popel, Dr. Mukherjee, Parents, and N.B.'s classroom teacher—reviewed N.B.'s progress in light of Dr. Mukherjee's neuropsychological evaluation, (Tr. 90), that revealed that he had made limited progress since kindergarten, exhibited maladaptive behaviors, and required 1:1 ABA to progress. (Ex. P-J at 5, 11).

Mr. Popel, who was personally familiar with N.B., (Tr. 70-72, 98-99; Ex. DOE-6 at 2 ¶ 7), testified that he believed N.B. should receive ABA, leading him to recommend a 12:1+1 special education class in a District 75 school where ABA could be provided. (Tr. 90 (ABA offered "programmatically in the specialized school program"), 95, 99-100). A District 75 setting, he explained, staffs BCBAs who are trained in ABA and they, in turn, train teachers and paraprofessionals in how to provide ABA services for a particular student. (Tr. 99-100).

The problem here occurred when Mr. Popel, in agreement with the ABA services for N.B., did not explicitly recommend ABA in N.B.'s IEP. According to him, "[i]t doesn't have to be stated [on the IEP] as ABA... we don't write ABA as recommendations … [and] I've never written an ABA-recommended service primarily pushing ABA." (Tr. 90). Consequently, because

17

of his own prohibition, the IEP failed to explicitly include ABA that the CSE recognized N.B. needed. As a result, the DOE school placement officer, who was in charge of finding a school that could implement the IEP, placed N.B. at P.S. R373 at 91 Henderson Ave—a school without ABA services. This was a vicious cycle, (1) the IEP did not include ABA which (2) resulted in N.B.'s assigned school, P.S. R373 at 91 Henderson Ave, not providing it. In that regard, that school's assistance principal testified that, in the school placement process, "we just go from the IEP." (Tr. 118).[7]

Thus, absent an explicit IEP mandate for ABA services, N.B. had no legal or practical guarantee of receiving those services, and was, consequently, denied a FAPE. *See A.M.*, 845 F.3d at 544-45 (adequacy of IEP required "some level of ABA support"); *see also R.E.*, 694 F.3d at 194 (no "guarantee of ABA therapy" without IEP mandate).

The Second Circuit's previous rulings in similar cases direct that, in this case where all involved in the IEP decision-making process agree the student requires ABA, the IEP must contain some level of ABA. For example, the Court in *A.M. v. New York City Department of Education* reiterated its prior holding in *R.E.*:

> [W]hen the reports and evaluative materials present at the CSE meeting yield a clear consensus, an IEP formulated for the child that fails to provide services consistent with that consensus is not "reasonably calculated to enable the child to receive educational benefits … and the state's determination to the contrary is thus entitled to no deference because it is unsupported by a preponderance of the evidence."

*A.M.*, 845 F.3d at 543 (2d Cir. 2017) (internal citations omitted). In both *A.M.* and *R.E.*, while the CSEs relied on reports consistently recommending 1:1 ABA therapy, the resulting IEPs nonetheless failed to include ABA. The Court held that, absent contradictory evaluations, the

---

[7] The transcript at 118 incorrectly identifies the testifying witness as "Ms. Barrow." The testifying witness was, instead, "Mr. Vastano," the assistant principal of P.S. R373 at 91 Henderson Ave in Staten island, New York.

CSE was "bound" to provide some level of ABA support. *A.M.*, 745 F.3d at 545 (CSE "bound" to recommend ABA "where the consensus of evaluative material" recommended need for 1:1 ABA therapy); *R.E.*, 694 F.3d at 194 (where "almost all of the reports [before the CSE] found that [the student] needed … ABA," IEP that offered "no guarantee of ABA" was "not reasonably calculated to create educational benefit[s] for [the student]"); *see also C.F.*, 746 F.3d at 81 ("overwhelming testimony that 1:1 instruction was necessary" rendered "such [1:1] instruction … a necessary component of any plan 'reasonably calculated to enable the child to receive educational benefits'") (internal citation omitted).

The principle established in *A.M.*, *R.E.*, and *C.F.* has obvious relevance herein. The only evaluation used by the June 27, 2023 CSE was Dr. Mukherjee's neuropsychological evaluation that indicated N.B. required 1:1 ABA services, having ruled out other approaches, such as TEACCH and DIR/Floortime, as inadequate to address his interfering behaviors. (Tr. 332-33, 341). Indeed, the facts herein are even stronger than those in *A.M.*, *R.E.*, and *C.F.*, where the CSEs in those cases were presented with clear consensus evidence but did not recommend services commensurate with that evidence either because they disagreed with or failed to meaningfully consider it. *A.M.*, 845 F.3d at 533 (DOE "deliberately" excluded ABA from IEP); *R.E.*, 694 F.3d at 194 (resulting IEP failed to "guarantee ABA therapy or any meaningful 1:1 support" against "clear consensus"); *C.F.*, 746 F.3d at 81 ("Department failed to consider a 1:1 ratio placement classroom, despite overwhelming evidence that [the student] required one").

Here, relying on Dr. Mukherjee's evaluation, there was unanimity of opinion that N.B. should receive ABA.[8] In that regard, Mr. Popel testified: "the recommendation I made had the

---

[8] The record is replete with examples of Dr. Mukherjee's testimony that N.B. required ABA. (Tr. 332-33, 340, 341, 350, 354) ("he needs a very specialized [behavioral] intervention"), 357 ("this needs to be an ABA intervention for

intention of ... everyone that works with him being trained in methodologies, data-driven behavior interventions ... trained by BCBAs," identifying those "methodologies" as ABA. (Tr. 90, 95, 99-100). The DOE failed N.B. by not explicitly mandating the services in his IEP, (the IDEA's required vehicle of service delivery), but instead inappropriately opted to deliver ABA services via a District 75 school placement. In other words, Mr. Popel's decision to omit an explicit recommendation of any amount of ABA in the IEP led to another DOE employee (the placement officer), who appropriately relied on that IEP, to assign a school that did not offer the services that N.B. indisputably needed.

Based on the foregoing, the preponderance of the evidence establishes that N.B. needed ABA in his IEP to achieve meaningful educational progress. The June 27, 2023 IEP, by failing to recommend that service, was neither tailored to N.B.'s unique needs nor reasonably calculated to confer upon him educational benefits. As a result, the DOE denied N.B. a FAPE.

### *SRO and IHO Decisions Merit No Deference*

The SRO failed to consider substantial evidence or explain how the resulting IEP, without ABA services, could have met N.B.'s needs.

<u>First</u>, the SRO's finding that the CSE "concluded that ABA was not necessary" for N.B.'s education, (SRO 24-048 at 14), was factually wrong—the CSE did not so conclude. To the contrary, the CSE intended that N.B. receive ABA, as evident by the fact that Mr. Popel recommended changing N.B.'s placement to a District 75 school where BCBAs train and supervise teachers, paraprofessionals, and service providers in ABA. (Tr. 95, 99-100).

---

[N.B.]"); Exhs. P-J at 11, 12, P-L at 5-6 ¶¶ 14, 15, 16 ("[ABA] services are necessary for [N.B.] to make any academic, social, emotional, and behavioral progress."), 17, 22, 23, 24, P-N at 5 ¶ 11).

Second, the SRO failed to consider evidence of N.B.'s need for ABA services. The record contains uncontroverted evidence that N.B. required ABA instruction, and that ABA was essential for his academic, social, emotional, and behavioral progress. (Tr. 332-33, 340-41, 357-58; Exhs. P-L at 5-6 ¶¶ 14-16, P-J at 11). Despite Dr. Mukherjee's evaluation and lengthy testimony stressing the critical role of ABA for N.B.'s educational development, the SRO improperly dismissed Dr. Mukherjee's opinion as merely having "felt … [ABA] could have been beneficial." (SRO 24-048 at 13). By disregarding substantial and uncontroverted evidence of N.B.'s need for ABA, the SRO's analysis was fatally flawed and merits no deference. *See M.H.*, 685 F.3d at 252 ("SRO's failure to consider any of the evidence regarding the ABA methodology and its propriety for [the student] is … a failure to consider highly significant evidence in the record.").

Third, without any support in the record, the SRO concluded that N.B. did not require ABA services because he allegedly "received educational benefit[s]" during the 2022-2023 school year without ABA. (SRO 24-048 at 13-14). In doing so, the SRO merely catalogued the IEP contents without explaining how the listed information translated as educational benefits,[9] (SRO 24-048 11-13). *See L.R. v. NYC Dep't of Educ.*, 193 F. Supp. 3d 209, 216 (E.D.N.Y. 2016) (SRO's account of IEP contents "does not explain why a 15:1 class is specifically appropriate to [the student]."). Tellingly, the record contains no evidence of N.B.'s progress toward his 2022-2023 annual goals—the IDEA's standard for determining educational progress. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(III); *M.H.*, 685 F.3d at 242–43 (substantive adequacy of IEP limited to examination of objective evidence).

---

[9] SRO lists N.B.'s assessments, disability-related difficulties, his functional levels in speech, language, social skills, and motor skills. (SRO 24-048 at 11-13).

Contrary to the SRO's finding of educational benefits during the 2022-2023 school year, the record contains ample evidence of N.B.'s lack of progress which the SRO ignored. For example, (1) N.B.'s "academic and communication delays," which according to the CSE required "additional support,"(Ex. DOE-6 at 10 ¶ 30); (2) N.B.'s "limited progress" during kindergarten (2022-2023 school year) according to the neuropsychological evaluation, (Ex. P-J at 11); (3) N.B.'s daily maladaptive behaviors that interfered with his learning despite having a full-time 1:1 Health Para, as testified to by Dr. Mukherjee, (Tr. 334-35, 374; Ex. P-J at 5); (4) N.B.'s regression in verbal skills, newly exhibited problem behaviors, and no academic progress by the end of the 2022-2023 school year, as testified to by Parent, (Tr. 151; Ex. P-O at 3-4 ¶ 8); and (5) undisputed evidence of N.B.'s "minimal progress" and regression in his speech and spontaneous language, (Tr. 151; Exhs. P-J at 10, DOE-6 at 3 ¶ 13). The SRO's failure to carefully consider this highly significant evidence of lack of progress undermines its finding that N.B. achieved educational benefits during the 2022-2023 school year. *See F.O.*, 976 F. Supp. 2d at 514-15 ("it is difficult to imagine how failing to address conflicting evidence could produce a 'well-reasoned' decision.") (internal citation omitted).

The SRO's educational benefits finding is further inconsistent with its ultimate conclusion that the IEP, inclusive of the District 75 school mandate, was appropriate. The District 75 school designated for N.B. was more restrictive because, unlike P.S. 8, it did not enroll nondisabled general education students. (Tr. 97). Under 20 U.S.C. § 1412(a)(5)(A), a CSE is only authorized to remove a student to a more restrictive environment if the student cannot achieve a satisfactory education in a less restrictive setting. *See P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119 (2d Cir. 2008) ("special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only

when the nature or severity of the disability of a child is such that *education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily*") (*quoting* 20 U.S.C. § 1412(a)(5)(A)) (emphasis added). It is illogical to conclude, as the SRO did, that N.B. (1) achieved educational benefits during the 2022-2023 school year at P.S. 8; and, at the same time, (2) needed to be removed from that non-specialized Community School, where he could not receive a satisfactory education, to a more restrictive segregated placement in a District 75 school. The two are mutually exclusive.

The SRO's determination that N.B. did not require ABA based on purported progress during the 2022-2023 school year is unsupported. The SRO's decision, having failed to adequately analyze this dispositive issue, i.e., whether the IEP as a whole without ABA was likely to produce reasonably progress, was poorly reasoned and, thus, not deserving of deference. *T.C. v. NYC Dep't of Educ.*, No. 15 CIV. 2667 (KPF), 2016 WL 4449791, at *26 (S.D.N.Y. Aug. 24, 2016) (SRO failed to determine "whether the IEP as a whole … was likely to produce progress for [student] absent use of DIR methodology"); *E.H. v. NYC Dep't of Educ.*, 611 F. App'x 728, 731 (2d Cir. 2015) (SRO "failed to evaluate whether [student] could progress without [methodology called] 'DIR/Floortime.'").

Likewise, the IHO decision is not deserving of deference. While the IHO correctly recited the record demonstrating that the CSE agreed that N.B. needed ABA, (*see* IHO Decision at 7: "Witness #1 testified that the program recommended for the Student 'offers ABA methodology that is programmatically in the specialized school program of 12:1:1'"), she then failed to determine whether the IEP was appropriate without ABA, as would have been required by *A.M. v. New York City Department of Education*, 845 F.3d 523 (2d Cir. 2017). The IHO, instead, found, without any consideration whatsoever, that "ABA is not written as a direct

recommendation in an IEP." (IHO Decision at 7). By doing so, she essentially dodged the substantive issue in this case: whether the DOE should have been included ABA in N.B.'s IEP. *See J.D.*, 677 F. App'x at 713 (2d Cir. 2017) (no deference given where state administrators failed to explain the adequacy of the services provided).

In addition, the IHO erred by improperly relying on retrospective evidence to suggest that N.B. would have received the needed ABA service, or its equivalent, despite the IEP not recommending it. In this Circuit, reliance on such after-the-fact evidence when evaluating an IEP's appropriateness is prohibited. *R.E.*, 694 F.3d at 186 ("retrospective testimony that the school district would have provided additional services beyond those listed in the IEP may not be considered in a Burlington/Carter proceeding."). Yet, the IHO did so twice: first, by improperly relying on Mr. Popel's statement that the "[District 75] program recommended for the Student 'offers ABA methodology,'" (*see* IHO Decision at 7), which was not mentioned in the IEP; and second, by relying on testimony of the assistant principal at P.S. R373 at 91 Henderson Ave that the DOE could "locate one of our nine locations where ABA therapy may be beneficial," (*id*. at 8, 19), even though not offered in the IEP or at the offered school, P.S. R373 at 91 Henderson Ave. *See Reyes v. NYC Dep't of Educ.*, 760 F.3d 211, 220 (2d Cir. 2015) (a deficient IEP may not be rehabilitated after the fact); *V.S. ex rel. D.S. v. NYC Dep't of Educ.*, 25 F. Supp. 3d 295, 300 (E.D.N.Y. 2014) ("testimony regarding … the substituted school-should have been excluded as retrospective, that is, beyond the scope of the IEP and its implementation."). By improperly relying on this evidence, the IHO failed to seriously assess whether the IEP could meet N.B.'s needs without 1:1 ABA and, as such, is not entitled deference.

For the foregoing reasons, neither the SRO nor the IHO decisions merit judicial deference.

**B. The DOE's June 27, 2023 CSE Engaged in Impermissible Predetermination in Deciding Not to Recommend ABA in N.B.'s IEP; the SRO and IHO Failed to Determine This Issue and Merit No Judicial Deference**

Neither the SRO nor the IHO decided whether the DOE's decision to not include ABA in N.B.'s IEP amounted to impermissible predetermination. While the IHO did not address this issue at all, the SRO's predetermination discussion focused on whether the CSE considered recommending a nonpublic school that could offer ABA—not whether the CSE meaningfully considered recommending ABA in N.B.'s IEP, the issue Parents pled in their DPC. (Ex. P-A at 4). The SRO's failure to decide the precise predetermination issue at hand merits no deference. *See E.H. v. NYC Dep't of Educ.*, 164 F. Supp. 3d 539, 553 (S.D.N.Y. 2016) (SRO decision "neither persuasive nor consistent with the proper inquiry" where it "failed to analyze the record to answer the relevant question of whether the Parent was denied [a] meaningful opportunity to participate with respect to her concern that [the student] required a more restrictive setting than 6:1:1").

The record evidence establishes that the CSE engaged in impermissible predetermination by refusing to include ABA in N.B.'s IEP. If a school district refuses to consider a parent's concerns and predetermines the contents of the IEP, it deprives the parent of meaningful participation in the IEP decision-making process. *See T.K. v. NYC Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) ("Department's persistent refusal to discuss [student's] bullying at important junctures in the development of her IEP" constituted predetermination.); *E.H.*, 164 F. Supp. 3d at 553 (CSE refusal to consider parent concern for lower student-to-teacher ratio than public school could offer constituted predetermination); *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1189 (11th Cir. 2015) (finding predetermination where district recommended student's school placement and "was unwilling to consider any other options" despite Parent's concerns); *Deal v.*

*Hamilton County Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2008) ("Participation must be more

than mere form; it must be *meaningful*.") (emphasis in original).

        Here, Mr. Popel candidly testified, "we [the CSE] don't write ABA as recommendations .

. . I've never written an ABA recommended service." (Tr. 90). It did not matter that Parents and

Dr. Mukherjee asked the CSE to include ABA in N.B.'s IEP, that even Mr. Popel himself

believed N.B. required ABA, or, most importantly, that N.B. was clearly responsive to 1:1 ABA

and required it, as documented in the neuropsychological evaluation, the sole evaluative data

before the CSE. (*See* Tr. 90, 100; Exhs. P-J at 11, P-L at 5, 7 ¶¶ 15, 20, P-O at 4-7 ¶¶ 10, 14, 15).

The CSE refused to write an explicit ABA mandate in N.B.'s IEP, irrespective of Parents'

concerns and N.B.'s need for the services, as the IHO merely commented: "ABA is not written

as a direct recommendation in an IEP," (IHO Decision at 7). *See Deal*, 392 F.3d at 858 (facts

"strongly suggest … an unofficial policy of refusing to provide one-on-one ABA programs and

that School System personnel thus did not have open minds and were not willing to consider the

provision of such a program. This conclusion is bolstered by evidence that the School System

steadfastly refused even to discuss the possibility of providing an ABA program, even in the face

of impressive results."); *E.H.*, 164 F. Supp. 3d at 552 ("If the CSE refused to consider a more

restrictive ratio than its public offerings were able to provide, that would amount to

predetermination of [the student's] education program regardless of what [the student] needed or

what his Parent contributed to the process."). The evidence is clear that the CSE was not open-

minded with respect to N.B.'s need for ABA as an IEP mandate. *Deal*, 392 F.3d at 858 ("district

court erred in assuming that merely because the [Parents] were present and spoke at the various

IEP meetings, they were afforded adequate opportunity to participate").

As set forth above, without an IEP mandate, N.B.'s entitlement to ABA was left entirely to chance. Even though Mr. Popel recommended a change in placement to a District 75 school with the intention that N.B. receive ABA, he, himself, was not involved in placing N.B. in a school that could provide it—that was the job of a DOE placement officer. (Tr. 93). And, given an IEP that contained no mention of ABA, the placement officer assigned N.B. to P.S. R373 at 91 Henderson Ave that did not offer it. (Tr. 119). Mr. Popel's belief that the IEP somehow offered this student ABA "programmatically in the [recommended] specialized school program of 12:1:1," (Tr. 90), was based on his unfortunate and ill-conceived assumption that N.B. could, in fact, receive that service absent an explicit IEP mandate.

The CSE's predetermined decision to not recommend ABA in N.B.'s IEP deprived Parents of their right to meaningful participate in the IEP decision-making process, resulting in educational loss and a denial of FAPE. *See E.H.*, 164 F. Supp. 3d at 554 ("predetermination … denied both the Parent her right to meaningfully participate in the IEP process, and [the student] right to an appropriate placement."); *Deal*, 392 F.3d at 858 ("The clear implication is that no matter how strong the evidence presented by the [Parents], the School System still would have refused to provide the services. This is predetermination.").

In sum, the facts herein present a text-book case of predetermination, which amounted to a substantive procedural violation that deprived Parents of a meaningful opportunity to participate in N.B.'s IEP and placement process, resulting in denying N.B. a FAPE.

### C. The DOE Committed Substantive Procedural Violations in Failing to Conduct a Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP"), Resulting in a Denial of FAPE; the SRO Erred in Concluding Otherwise, and the IHO Erred in Failing to Decide the Issue; Neither Merit Deference

The CSE's failure to conduct an FBA and develop an appropriate BIP constituted a substantive procedural violation. 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i); 8

NYCRR § 200.4(b)(1)(v), (d)(3)(i), 200.22(a)(3). Under New York State law, a school district is required to conduct an FBA "for a student whose behavior impedes his or her learning or that of others." 8 NYCRR § 200.4(b)(1)(v). The Second Circuit has determined that a district's "failure to conduct an FBA is a particularly serious procedural violation for a student who has significant interfering behaviors," *L.O.*, 822 F.3d at 113 (*quoting R.E.*, 694 F.3d at 194), and that such failure "prevent[s] the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all." *Id.* at 112. The Second Circuit has further concluded that, based on the FBA results, a "BIP must be developed with strategies to deal with the problem behavior(s) … [and] include[] … global and specific hypotheses as to why the problem behavior occurs." *Id.* at 111-12 (*citing* 8 NYCRR § 200.1(mmm)).

While the CSE was aware of N.B.'s "significant interfering behaviors," (Tr. 320, 334-35, 347; 351-53, 374; Exhs. DOE-1 at 3-4 (June 27, 2023 IEP documenting "significant interfering behaviors"), P-J at 5 (classroom observation of behaviors)), it failed to conduct an FBA and develop an appropriate BIP or otherwise appropriately address his behaviors by, for example, providing annual goals or interventions to specifically address his "significant interfering behaviors." (Ex. DOE-1 at 4). The CSE's failure to gather needed behavioral information through an FBA and BIP deprived Parents of vital information, including the root causes of N.B.'s behaviors and ways to treat them. *L.O.*, 822 F.3d at 113 ("neither [IEP] attempted to identify the root causes of these behavioral deficiencies so that they could be properly addressed and treated").

The absence of this behavioral information significantly impeded Parents' opportunity to meaningfully participate in N.B.'s decision-making process and deprived the CSE of needed

information to draft an appropriate IEP that could address his behaviors, resulting in a denial of a FAPE. *See L.O.*, 822 F.3d at 113 ("Because the CSE failed to address the root causes of [the student's] behavioral deficiencies, we are unable to determine whether the IEPs adequately identified [the student's] behavioral impediments and whether the strategies formulated to address those behaviors were appropriate."); *R.E.,* 694 F.3d at 190 ("The entire purpose of an FBA is to ensure that the IEP's drafters have sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors.").

The SRO erred in concluding that an FBA and BIP were not required because the IEP's recommended a 1:1 Health Para, management needs, and speech and language goals and services addressed N.B.'s problem behaviors in a 12:1+1 special education class. (SRO 24-048 at 9-10). First, the SRO ignored the fact that N.B.'s problem behaviors persisted during the 2022-2023 school year despite having such full-time 1:1 Health Para and speech and language goals and services in a 12:1+1 special education class at P.S. 8. (Tr. 79, 352-53 (Dr. Mukherjee testimony: 1:1 Health Para insufficient to change problem behaviors); Exhs. DOE-6 at 4 ¶ 14, DOE-4 at 2, DOE-1 at 10-12, P-L at 7 ¶ 20, P-O at 7 ¶ 14); *see C.L. v. NYC Dep't of Educ.*, No. 12 CIV. 1676 (JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013) ("the critical fact remains that the SRO did not grapple with contrary evidence"), *aff'd*, 552 F. App'x 81 (2d Cir. 2014), *as amended* (Feb. 3, 2014). Second, as for the management needs, the SRO merely listed them and summarily concluded, without citing to any supporting evidence, that N.B. was "successful with these types of supports and strategies,"—nor could she cite to any such evidence because N.B.'s behaviors had failed to improve in the 2022-2023 school year with those supports and strategies, and the SRO failed to explain how N.B. could succeed with them in the 2023-2024 school year. At bottom, the SRO failed to explain how the 1:1 Health Para, speech and language services and

management needs "successfully" addressed each of N.B.'s multitude of interfering behaviors, including "running away, crying, whining, screaming," (SRO 24-048 at 10), and, thus, failed to take the necessary "particular care to ensure that the IEP adequately address[ed] the child's problem behaviors," required by this Circuit when an FBA is not conducted in these circumstances. *L.O.*, 822 F.3d at 112 (*quoting R.E.*, 694 F.3d at 190); *C.F.*, 746 F.3d at 80 (BIP "failed to match strategies with specific behaviors, instead simply listing behaviors and strategies."); *B.R. ex rel. K.O. v. NYC Dep't of Educ.*, 910 F. Supp. 2d 670, 676 (S.D.N.Y. 2012) ("conclusory generalities and unsupported assertions … is not the kind of reasoning that passes muster"); *R.K. v. NYC Dep't of Educ.*, No. 09-CV-4478 (KAM), 2011 WL 1131492, at *19 (E.D.N.Y. Jan. 21, 2011) ("Merely describing problematic behavior and listing several goals for improvement are not adequate substitutes for the FBA and BIP."), *report and recommendation adopted*, No. 09-CV-4478 (KAM) (RLM), 2011 WL 1131522 (E.D.N.Y. Mar. 28, 2011), *aff'd sub nom. R.E.*, 294 F.3d 167. As such, the SRO's decision was poorly reasoned and merits no deference. The IHO decision, having failed to decide this issue, also merits no deference.

In sum, the DOE's failure to include ABA on N.B.'s IEP and its failure to conduct an FBA and offer a BIP resulted in an IEP that was neither tailored to N.B.'s unique needs nor reasonably calculated to allow him to achieve meaningful educational progress. *See A.M.*, 845 F.3d at 545 (Court's determination that IEP's lack of ABA denied student a FAPE is "inescapable, 'particularly when combined with [*inter alia*] … the [DOE's] failure to [conduct] an adequate, individualized [FBA]' … [and] failure to prepare an adequate BIP."). As the Second Circuit surmised, "we are left to wonder whether the DOE would have reached the same conclusion and recommended the same deficient services in the IEP … had [it] adequately complied with the IDEA's procedures in the first instance." *Id.* (*citing C.F.*, 746 F.3d at 81).

## II.    TRIBECA PREPARATORY SCHOOL WAS AN APPROPRIATE PLACEMENT FOR N.B.

Neither the SRO nor the IHO decided whether Parents' unilateral placement at the Tribeca Prep was appropriate. (SRO 24-048; IHO Decision at 19). The Second Circuit has adopted a "totality of the circumstances" framework to analyze a parent's claim for tuition reimbursement that looks to whether the parent's unilateral "placement provides educational instruction specially designed to meet the unique needs of a [student with a disability], supported by such services as are necessary to permit the child to benefit from instruction." *Gagliardo*, 489 F.3d at 112 (internal quotation and citation omitted). Relevant factors include whether the private school is designed to serve students with the child's disability, and evidence of the child's progress. *See T.K. v. N.Y.C. Dep't of Educ.*, 810 F. 3d at 878 (school dedicated to students with learning disabilities was appropriate for learning-disabled child).

The evidence in the record is uncontroverted that Tribeca Prep appropriately met N.B.'s unique needs for the 2023-2024 school year. Tribeca Prep is a school for students like N.B., with autism and developmental delays, academic delays, social delays, communication deficits, (Exhs. P-M at 2 ¶ 5; P-C at 1), and offered him specially designed instruction that closely tracked Dr. Mukherjee's recommendations: (1) a full-time 1:1 ABA program; (2) a small highly structured therapeutic, special education classroom; (3) BCBA oversight; (4) related services of Speech and Language, Occupational, and Physical Therapies; and (5) social skills instruction. (Exhs. P-J at 11-13, P-L at 8-9 ¶¶ 23, 24, P-M at 10-11, 13-17, 18-19 ¶¶ 22, 25, 26, 36-52, P-N at 7-8 ¶ 15). *See supra* at pages 6-10.

As a result, N.B. had shown progress. *See supra* at page 10. The preponderance of the evidence thus establishes that Tribeca Prep offered N.B. an appropriate program, satisfying Parents' Prong II burden and entitling them to payment of Tribeca Prep's tuition. *M.M.*, 2024

WL 3904771, at *7 ("Having conducted an independent review of the record, I am convinced that [unilateral private school placement] was specially designed to meet [the student's] unique needs, and her academic progress confirms that the design was successful.").

### III.   THE EQUITIES SUPPORT PARENTS' REQUEST FOR PAYMENT OF TRIBECA PREPARATORY SCHOOL TUITION FOR THE 2023-2024 SCHOOL YEAR

The proper focus when balancing the equities looks to whether a parent's actions have obstructed or hindered the school district's efforts in providing the student a FAPE. *See C.L. v. Scarsdale Union Free Sch. Dist.,* 744 F.3d 826, 840 (2d Cir. 2014) ("[i]mportant to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA"); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 587 (S.D.N.Y. 2010) (equities supported parent's claim for tuition where parent's actions did not harm IEP decision-making process), *aff'd sub nom. G.B. v. Tuxedo Union Free Sch. Dist.*, 486 F. App'x 954 (2d Cir. 2012).

Here, Parents fully cooperated with the DOE at every step of the IEP and placement process. (Tr. 184-85). They participated in the first May 23, 2023, IEP review meeting and provided the CSE with Dr. Mukherjee's May 2023 letter outlining her preliminary findings and recommendations. (Exhs. K, P-O at 5-6 ¶ 12). Upon receiving Dr. Mukherjee's Evaluation, Parents provided it to the CSE and participated in the June 27, 2023 CSE meeting in consideration thereof. (Ex. P-O at 6-7 ¶ 14). They then visited and inquired into the offered school placement, P.S. R373 at Henderson Ave. (Ex. P-O at 8-9 ¶¶ 16, 17). Parents, through their attorney, notified the DOE in writing detailing their disagreement with the IEP and placement and stating their intention to unilaterally place N.B. at Tribeca Prep at public expense, which they would seek through an impartial hearing, (Ex. P-B). *See S.B. v. NYC Dep't of Educ.*, 174 F.

Supp. 3d 798, 806 (S.D.N.Y. 2016) ("no dispute that the parents cooperated in good faith with the DOE"); *see also G.B. v. NYC Dep't of Educ.*, 145 F. Supp. 3d 230, 258 (S.D.N.Y. 2015) (equities favored parents who "consistently acted reasonably and promptly"). Not having received a response from the DOE, only then did Parents unilaterally place N.B. at Tribeca Prep for the 2023-2024 school year and pursue their remedy through an impartial hearing.

Based on the foregoing, equitable considerations fully support Parents' claim warranting full reimbursement for the cost of N.B.'s tuition at Tribeca Prep for the 2023-2024 school year.

## IV.    THE DOE VIOLATED N.B.'S RIGHTS UNDER SECTION 504 OF THE REHABILITATION ACT

To establish a violation of Section 504, a plaintiff must prove that:  (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" for the program; (3) he is excluded from the program benefits solely because of his disability; and (4) and the program receives federal funding. *C.L.*, 744 F.3d at 840-41; 29 U.S.C. § 794. The Second Circuit has recognized that "a Section 504 claim may be predicated on the claim that a disabled student was 'denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive.'" *C.L.*, 744 F.3d at 841. Thus, even where a child is determined to have received a FAPE under the IDEA, this "does not mean he is being provided with an '*equal opportunity* to participate in, and enjoy the benefits of, a service, program, or activity of a public entity,'" *Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 981 (3d Cir. 2024) (*citing* 28 C.F.R. § 35.160(b)(1)) (emphasis in original).

Additionally, Section 504 claims require a showing that "a school district acted with bad faith or gross misjudgment," *S.W. and JW v. Warren*, 528 F. Supp. 2d 282, 289 (S.D.N.Y. 2007) (*quoting Scaggs v. N.Y. State Dep't of Educ.*, 2007 WL 1456221, at *8 (E.D.N.Y. May 16, 2007)), or with "'deliberate indifference' to the rights secured by [Section 504])," *J.L. on behalf*

*of J.P. v. NYC Dep't of Educ.*, No. 17-CV-7150 (PAC) (KHP), 2024 WL 2864330, at *15 (S.D.N.Y. Jan. 26, 2024), *report and recommendation adopted in part sub nom. J.L. on behalf of J.P. v. NYC Dep't of Educ.*, No. 17 CV 7150 (DLC), 2024 WL 2700563 (S.D.N.Y. May 24, 2024) (*citing Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir. 2001)).

Neither the IHO nor the SRO decided N.B.'s Section 504 claim. Under this Court's de novo review, the record establishes that the DOE denied N.B. an "equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). There can be no dispute that (1) as a student with autism, N.B. presents with an impairment that substantially limits a major life activity, and is, thus, qualified as a person with a disability under Section 504; and (2) as a New York resident, he is entitled to a public education from the DOE, an entity that receives federal funding. The evidence shows that N.B. was excluded from effective participation in the DOE's educational program because he was denied ABA, which he required to access his education. (Exhs. P-K at 1 (Dr. Mukherjee letter: "[N.B.] requires a full-time, intensive 1:1 ABA program … to reduce interfering behaviors that prevent him from being available for learning and accessing the curriculum."), P-L at 4-5 ¶ 12 (Dr. Mukherjee affidavit testimony: "[N.B.'s] social/emotional and behavioral delays prevent him from accessing his school and learning environment") P-L at 6 ¶ 17). In doing so, the DOE "denied [him] access to a free appropriate education, as compared to the free appropriate education non-disabled students receive" because of his disability. *S.W,* 528 F. Supp. 2d at 290.

The DOE actions evinced deliberate indifference and bad faith: (1) Mr. Popel acknowledged N.B.'s need for ABA; (2) he recommended changing his placement from P.S. 8 to a District 75 school so that he would receive it; yet all the while (3) knowing of only one District

75 school that actually offered the needed services. (Tr. 102). Despite the above, Mr. Popel

refused to put ABA on N.B.'s IEP—the IDEA's only vehicle to guarantee that N.B. would

receive the services and, in practice, the DOE's only pathway to ensure its placement officers

would locate a school that could provide N.B. the services. Mr. Popel was aware that, by

excluding ABA from N.B.'s IEP, he had made it impossible to ensure that he would receive

necessary ABA services. Far from an unfortunate oversight or inadvertent error, the CSE's

unwillingness to explicitly recommend ABA was intentional. *Cf.*, *J.L.*, 2024 WL 2864330, at *17

(rational juror might find DOE's "serious shortcomings do not rise to the level of deliberate

indifference, but rather are attributable to other factors, such as incompetent and/or overworked

staff or a lack of appropriate funding, over which the DOE has very little control"). Knowing

N.B. needed ABA, but might not get it if not on the IEP, Mr. Popel's omitting ABA from N.B.'s

IEP amounted to bad faith decision-making that eventually ensured that N.B. would *not* receive

it, and ultimately denied him the needed service and, thus, a FAPE.

## CONCLUSION

For the foregoing reasons, Parents' Motion for Summary Judgment should be granted.

Parents request that summary judgment be entered reversing the SRO's decision and awarding

payment of N.B.'s tuition at Tribeca Prep for the 2023–2024 school year.

Dated:  New York, NY
        December 12, 2024

ATTORNEYS OF RECORD:

___/s/Anton Cohen_____            __/s/Sandra Robinson_____
Anton Cohen (AC 4680)                       Sandra Robinson (SR 8646), Of Counsel
LAW OFFICE OF ANTON G. COHEN, P.C.          LAW OFFICE OF ANTON G. COHEN, P.C.
*Attorney for Plaintiff*                     *Attorney for Plaintiff (of-counsel)*
618 Coney Island Avenue                     618 Coney Island Avenue
Brooklyn, NY 11218                          Brooklyn, NY 11218
(718) 702-5702                              (646) 532-7499
Email: Anton@aplawny.com                    Email: Sandra@aplawny.com